UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
JAMES CORLEY,                                               :
                                                            :
                                    Plaintiff,              :
                                                            :   **MEMORANDUM OPINION**
             - against -                                    :
                                                            :   13 Civ. 4743 (BMC)
P,O. NABEEL SHAHID, Tax Registration No.                    :
939457; P.O, CYRIL ABRAHAM, Tax                             :
Registration No. 937932; P.O, RONALD MOSS,                  :
Tax Registration No. 918036;  P.O. JAMES                    :
CAMPBELL, Tax Registration No. 945547;                      :
SERGEANT SHI-INPING MAO, Tax                                :
Registration No. 940417; CAPTAIN                            :
RODERICK DANTINI, TAX Registration No.                      :
906066 and THE CITY OF NEW YORK,                            :
                                                            :
                                    Defendants.             :
----------------------------------------------------------- X

**COGAN**, District Judge.

      This is an action under 42 U.S.C. § 1983 in which plaintiff claims that one of six defendant police officers used excessive force in arresting him and the five other defendant officers failed to intervene to prevent the use of excessive force.  At the conclusion of plaintiff's case at trial, I granted defendants' motion for judgment as a matter of law.[1]  This opinion expands upon the basis for that ruling as stated on the record.

## PLAINTIFF'S CASE

      Plaintiff called two witnesses at trial.  First, he called Dr. Ronald Light, an orthopedist offered as a non-treating expert.  Then, he called himself.  For ease of understanding, it is useful to summarize plaintiff's testimony first.

---

[1] For convenience, I will refer to defendants' motion as one seeking a directed verdict.

Plaintiff is a 54 year old retired fireman. On the night of June 1, 2012 at about 11:00 p.m., he pulled his minivan in front of the Dog & Duck bar in Sunnyside, Queens. Plaintiff had been at the bar earlier that evening to drop off some fish that he caught; he returned to pick up the cooler in which he had delivered the fish. There was no parking in front of the bar, and plaintiff did not attempt to find any on the street. Instead, he double parked in front of the bar, blocking in a car that was parked at the curb. Plaintiff did not attempt to find a legal parking space because he thought it unlikely that he would find one.

Once in the bar, plaintiff decided to order food and drink. He sat at the bar and consumed five or six beers. He testified on direct testimony that he became drunk, describing himself, on a scale of 1 to 10 of inebriation, as an "8." His hospital record from the following morning showed that he still had a 1.53 blood alcohol level, about twice the legal limit. Plaintiff acknowledged that this was not unusual for him and he drank in this manner about twice a week.

Plaintiff testified on direct examination that he could not see his minivan from where he was sitting in the bar, although he had testified at deposition that he could see the minivan from where he was sitting. In any event, he became aware that a police officer was alongside his minivan. Plaintiff assumed the officer was there to write him a ticket for double parking.[2] He nevertheless waited for about 45 minutes to leave the bar, despite the fact that the officer remained by his minivan. Plaintiff intended to wait until the police officer wrote him a ticket and left before moving the minivan.

At that point, about 12:30 a.m. on June 2, 2012, plaintiff observed that a flatbed tow truck had pulled up in front of his minivan, a truck which he assumed the police had called. The tow truck inclined its bed so that it could load plaintiff's minivan onto it. Plaintiff then left the bar

---

[2] Questioning on cross-examination suggested that the person whose car plaintiff had blocked in called the police, as plaintiff had blocked him in for several hours. However, there was no evidence as to that fact.

and approached the tow truck.  As he did so, the police officer said to him, "is that your car?"  Plaintiff said "yes" and kept walking.

Plaintiff laid himself down on his back on the inclined bed of the tow truck, which was about a foot from his minivan's bumper.  He also locked his hands under his minivan's bumper so that the minivan could not be loaded onto the tow truck without crushing him.  Plaintiff testified that only his legs were on the ground under the minivan; his torso was on the flatbed truck.  After two or three minutes, one or two of the officers then struck his hands with their police radios to get him to release his grip on the bumper.  Plaintiff testified that he did not sustain injuries from these blows and did not consider the force used to be excessive.

Plaintiff did not release the bumper and, about 30 seconds later, two police officers grabbed him under each arm and dragged him off the tow truck to their police car about 40 feet away.  Once there, he was flipped over face down on the street.  At that point, there were a total of four officers around him.  One held his knee on plaintiff's head to restrain it on the ground, while another held plaintiff's feet down.  There was another officer to plaintiff's right, who had control of plaintiff's arms, and one somewhere out to the left, who was just standing there.  The officer on the right who had control of plaintiff's arms handcuffed plaintiff's arms behind his back.  Up to this point, plaintiff testified that the actions of the police were not excessive and were indeed "professional."

Then, "within a matter of ten or fifteen seconds," one of the officers kicked him three times on the left side of his ribcage and then gave him two more kicks on the same side.  That officer then rolled plaintiff onto his back and kicked him twice more on the right side of his ribcage. Plaintiff testified that this caused him considerable pain.  Plaintiff started yelling "report

3

police brutality!" repeatedly. The police officer who had kicked him told him to "shut up … or I will taser you."

Plaintiff believed his ribs were broken as he had suffered broken ribs in the past and knew what it felt like. He testified that he was having trouble breathing. Nevertheless, he did not request an ambulance. The police called an ambulance which arrived ten or fifteen minutes later. Plaintiff testified that he told the EMT from the ambulance that "some police had assaulted him." However, the EMT's intake report showed only "Chief Complaint: intox[ication]" and contained "intox[ication]" as the "Presumptive Diagnosis." The intake report also said "transported to ER to get sobered up." There was no notation in the report about any pain or injury to plaintiff's ribs or any other injury, except for "abrasions" from "lying on the ground."

Plaintiff testified that once he arrived at Elmhurst Hospital, he reported to the emergency room doctor that he had been assaulted by "some police officers." He testified that the emergency room doctor examined his ribcage on both sides and "applied some pressure."

However, plaintiff's hospital records, completed in the early morning of his admission (plaintiff was admitted to the hospital at approximately 1:00 a.m.) listed plaintiff as the "historian", but contained no reference to any assault, nor did they say anything about a complaint of pain in the ribcage. Rather, the admissions record said: "Chief complaint, as per EMS, patient is intoxicated." It further stated, "admits drinking alcohol." There was also a notation that "[d]uring triage, seizure-like activity noted. Moved patient to cardiac room as per Dr. Tserkis' order." Under "History of present illness," there was no mention of an assault or being kicked in the ribs. Later on, the records note that plaintiff was placed on psychiatric observation for "unpredictable behavior."

4

Plaintiff, in his testimony, did not dispute that all that his hospital records showed upon admission was intoxication. Indeed, an examination of his abdomen was marked "non-tender" and "no gross deformities" under "musculoskeletal and external." As to "disposition," it stated "pending clinical sobriety, likely discharge into custody." It described plaintiff as "agitated" and that there was a "risk of injuring self." The records were also marked as "negative" under "signs of distress/chest pain" and "respiratory distress" at 3:45 a.m.

At 5:33 a.m., the records contained a notation, under "physician's assistant/resident assessment and plan," of suspected alcohol intoxication. Musculoskeletal was again marked as having "no obvious signs of trauma." Plaintiff received a CT scan at 6:16 a.m., and was returned from imaging at 8:04 a.m.

At 3:06 p.m. that afternoon, a nursing note read that plaintiff had left rib pain described as a "3" on a scale from one to ten, but also that he "denies chest pain, shortness of breath." This was the first notation in the medical records of any complaint by plaintiff about chest pain. By that time, plaintiff had become aware of the results of his CT scan, which showed nine rib fractures and a chipped vertebra.

At 9:40 p.m. that night, plaintiff's medical records contain a notation that "per the patient," he had been "kicked and hit both with fists and with a nightstick, especially on his left side." Plaintiff testified that he did not tell anyone at the hospital that the officers had hit him with fists or a nightstick and he denied at trial that they had done so. His testimony was clear that his claim for excessive force only related to the kicks described above. Plaintiff conceded that the first mention in his medical records of a claim of a police assault occurred after he received the results of his CT scan.

Plaintiff spent six days in the hospital, with some portion of it on a psychiatric hold. He was arraigned on various charges while in the hospital. Some time after his discharge, plaintiff pled guilty to resisting arrest.

Prior to plaintiff's testimony, Dr. Light testified that he had examined plaintiff for about two hours. He had no relationship with plaintiff other than as a retained expert in this case. He confirmed that plaintiff's CT scans showed nine fractured ribs and a chipped vertebra as a result of blunt force trauma. He further opined that these were not historical injuries because there was no sign of healing.

Finally, the parties introduced a stipulation that stated: "The plaintiff and the six defendants were all present at the scene of the incident that is the subject of this lawsuit."

Plaintiff then rested, and defendants made their motion for judgment as a matter of law on one ground: plaintiff had failed to identify any of the defendants as his assailant and had failed to demonstrate that any of the defendants were personally involved in the attacks or had an opportunity to intervene, yet declined to do so. After hearing argument and receiving briefing on this issue from the parties, I granted defendants' motion from the bench.

## DISCUSSION

Federal Rule of Civil Procedure 50 provides that

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may … grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1)(B). The Rule "imposes a heavy burden on a movant," and the motion can be granted "only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue.'" Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)); accord Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51, 120 S. Ct. 2097 (2000). In making this determination, the Court should review the record as a whole but "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 150-51, 120 S. Ct. 2097.

Because of this standard, I was careful, in ruling on defendants' motion, to disregard the very obvious credibility questions raised by plaintiff's testimony. These questions included whether plaintiff's detailed recollection of the incident should be disregarded because of his admitted extreme intoxication; whether he might have sustained his injuries by reason of wedging himself between two multi-ton vehicles; why if, as he testified, he told the EMT and emergency room doctors that he was assaulted by the police and had rib cage pain, his medical records say nothing beyond intoxication until after he was advised of the results of his CT nearly 15 hours later; and why those medical records describe the assault (using fists and a police baton) in a manner that is at odds with his trial testimony. For the same reason, I was equally careful to disregard questions as to his character that might bear on his credibility, including his willingness to drive his minivan from the bar with a blood alcohol level at nearly twice the legal limit; his disregard for the law, demonstrated by his allowing the police officers to spend 30-45 minutes writing a ticket without going out to move his minivan; and his lack of concern for the automobile owner whose car he had blocked for hours. Whether I would have granted a new trial had there been a plaintiff's verdict was not the issue before me. Defendants properly did not raise these credibility issues in their motion and they played no role in my decision to grant a directed verdict.

7

The point that defendants did raise, however, was the one to which plaintiff had no adequate answer – plaintiff failed to identify a single defendant as either participating in, or allowing, the alleged assault. Instead, plaintiff relied exclusively on the stipulation stating that all six police officer defendants were "present at the scene of the incident." Yet, under the law, mere presence is insufficient.

The Second Circuit has held that plaintiffs asserting claims under § 1983 must show the personal involvement of each defendant. See Rasanen v. Brown, 603 F. Supp. 2d 550, 553 (E.D.N.Y. 2009), citing, Back v. Hastings On Hudson Union Free School District, 365 F.3d 107, 122 (2d Cir. 2004). A police officer is personally involved in the use of excessive force if he either (1) directly participates in an assault; or (2) was present during the assault, but did not intervene on behalf of the victim *even though he had a reasonable opportunity to do so*. See Jeffreys v. Rossi, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) (emphasis added). "A plaintiff need not establish who among a group of officers, directly participated in the attack and who failed to intervene." Id. However, mere presence at the scene is not enough to create a disputed issue of material fact – a plaintiff must proffer "some competent evidence that he was attacked by the officers." Id. at 475; see also Rodriguez v. City of New York, No. 10 Civ. 9570, 2012 WL 1658303, at *5 (S.D.N.Y. May 11, 2012) ("[T]he mere fact that [an officer] was present for the entire incident does not, on its own, establish that he had either awareness of excessive force being used or an opportunity to prevent it."). There also must have been enough time for a bystanding officer to intervene. See O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (rejecting plaintiff's claims of failure to intervene as a matter of law where the alleged excessive force consisted of three rapid blows because the officer "had no realistic opportunity to prevent them"); see also Sash v. United States, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (finding that

no reasonable jury could conclude that the defendant officers had a genuine opportunity to intercede where "the entire incident took less than thirty seconds").

In Jeffreys, the plaintiff was attempting to burglarize a school. After being caught by police officers in a classroom, the plaintiff alleged that the officers struck him many times, even hitting him in the head with a flashlight. The plaintiff fought back, but was eventually knocked to the ground. Other police officers entered the classroom and continued to beat him. The plaintiff eventually blacked out. In support of his excessive force claim, he presented affidavits of family members (consisting mainly of information the plaintiff told them), his own testimony, the SPRINT report, and the testimony of the officers. The court found that this evidence was insufficient as a matter of law to support the plaintiff's excessive force claim.

Piper v. City of Elmira, 12 F. Supp. 3d 577 (W.D.N.Y. 2014), provides a good overview of the evidence required to survive a motion for a directed verdict. The plaintiffs alleged that the defendant officers used excessive force when they responded to the scene of a house party. Although the court held that some of the plaintiffs' excessive force claims created disputed issues of material fact, it granted the defendants' motion for summary judgment as to others. A number of the defendant officers moved for summary judgment because the plaintiffs did not allege that any of these defendants either participated in the wrongful conduct or failed to intervene. The court agreed, stating that plaintiffs' "Statement of Material Facts is devoid of any specific allegations with respect to any of these individual defendants." Id. at 596. Even though all of these officers were on scene, there was no evidence about their locations, "much less evidence that these officers were in a position from which they could have intervened during the challenged uses of force." Id. However, the court denied the summary judgment motion of other defendants who argued that there was no triable issue of fact with respect to their failure to

intervene. It reasoned that because the parties agreed that these officers participated in either the restraint or tasering of one of the plaintiffs, it was sufficient that plaintiffs established that the officers were present during these incidents, even if they did not establish who used force and who failed to intervene. See also Mikulec v. Town of Cheektowaga, 909 F. Supp. 2d 214, 222 (W.D.N.Y. 2012) (granting summary judgment to the defendant officers where the plaintiff established their presence at the scene, but could not establish that they "witnessed the alleged abuse or had an opportunity to stop it").

These cases show that the reason "mere presence" is insufficient is because it ignores the requirement that a plaintiff prove a defendant had a reasonable opportunity to intervene. A factfinder cannot find a failure to intervene, for example, where a police officer is 50 feet from his partner when his partner throws a single punch at a restrained suspect. The distant police officer could not have done anything about that. He did not fail to intervene; rather, he could not have intervened because he had no opportunity to do so. And as discussed below, while the instant case is not as clear cut as this example, it is not materially distinguishable. Furthermore, the instant case suffers from additional problems.

In determining to grant defendants' motion, I do not hold that plaintiff had an obligation to identify which police officer kicked him and which police officers failed to intervene. It would be too much to require a citizen subjected to a police attack to separately identify the role of each defendant – he is, after all, under attack. But plaintiff's problem here was that he introduced no evidence to show that *any* of defendants played *any* role in the attack, nor that *any* defendant had failed to intervene. He could not, and did not, point to any of the six defendants, and identify them, even though they were sitting in the courtroom. This deficiency permeated plaintiff's case through several levels.

First, by plaintiff's own testimony, only four police officers, at most, were in his vicinity when he was kicked. Yet he sued six. Other than plaintiff's "mere presence at the scene" theory, which I reject for the reasons set forth above, I saw no way for the jury to determine which two defendants to absolve at once and which four to more seriously consider. The jury would have had to guess which defendants to hold liable based on a complete absence of information. This meant that no reasonable jury could find that any particular officer either kicked plaintiff or failed to intervene.

Second, even if plaintiff could avoid this deficiency, and winnow defendants down to the four who he testified he saw, he failed to establish that at least one of the four had the opportunity to prevent the assault. As to this one unidentified police officer, plaintiff simply said the officer was "on his left." Plaintiff did not testify whether this was two feet to his left or ten feet to his left. A reasonable jury could not find that this fourth officer – whoever he is – had an opportunity to intervene.

Third, based on plaintiff's own testimony, a reasonable jury probably could not find that even the three officers who plaintiff testified made physical contact with him – and who, again, plaintiff did not identify – had an opportunity to prevent the assault. It must be remembered that plaintiff pled guilty to resisting arrest. He expressly denied that he had any complaint about the one officer restraining his feet, the one officer applying handcuffs, and the one officer restraining his head. Those officers were understandably engaged. Suddenly, without warning – again, according to plaintiff's testimony – he is kicked in the ribs, flipped over, and kicked again. This took a matter of a few seconds, according to plaintiff. It is not a five hour or even five minute beat down where someone nearby could have stopped it. The assault, according to plaintiff, happened and finished so fast, and with no warning whatsoever, that I doubt a reasonable jury

could find that even an officer standing right next to plaintiff had an opportunity to prevent the rapid fire kicks to which he claims he was subjected.

In my view, this inability of the closest non-kicking officers to prevent the assault remains secondary to the primary deficiency described above – plaintiff's failing to distinguish between officers who could have been either an assailant or an intervenor, from those who could not. We do not enter judgments against individuals in intentional tort cases based on speculation that they could have been involved. There is no non-conspiratorial theory of "group liability" under §1983. When a judgment is entered against a police officer, like anyone else, it is a serious matter – it puts his name on a federal court adjudication of intentional wrongdoing and, although his employer may ultimately indemnify him, it subjects his home and other assets to seizure to satisfy the judgment. It is probably not even dischargeable in bankruptcy as an intentional tort. See 11 U.S.C. § 523(a)(6). That is why, among other reasons, juries are routinely instructed to the effect that:

> Although the defendants in this trial are being represented by the same counsel, you are not to treat them as one person. Each defendant is entitled to your separate consideration. The question of whether liability has been proven is personal to each defendant and must be decided by you as to each defendant individually.

Sand, et al., *Model Federal Jury Instructions*, at 71-14 (instruction 71-8) (2014). I see no way that a reasonable jury could have complied with this instruction and still found in plaintiff's favor based on the evidence he presented.

Lest there be a concern that my ruling places any undue hardship on plaintiffs in excessive force cases, it must be remembered that this case was uniquely presented. I know that discovery occurred in this case, but plaintiff chose not to use any of it.[3] In every other §1983

---

[3] During the argument of the motion, plaintiff's attorney stated that he had intended to put information concerning the role of each defendant before the jury by cross-examining each defendant during defendants' case. This plan,

12

case that I have tried, the plaintiff's case has included one or some combination of either deposition excerpts from the defendant police officers, police documents, or live testimony from the police officer defendants called during plaintiff's case. There is invariably a police file with an arrest report which sets forth the activities of the various officers involved (and there must have been such a file in this case since plaintiff pled guilty to resisting arrest), so that even if a plaintiff contends that a police file contains false entries, that file will at least disclose information as to the purported role of each police officer involved.

For whatever reason, plaintiff failed to present any evidence to distinguish one defendant from another. Nor, when it became clear that the record was deficient during argument of defendant's motion, did he seek to reopen the record to cure the deficiency. I had to determine the Rule 50 motion on the basis of the record before me, and there was no way that a reasonable jury could return a verdict against any one, some, or all of the six defendants. I was therefore compelled to grant the motion.

The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       March 5, 2015

---

however, ignored the fact that plaintiff had to put on a *prima facie* case before defendants would have any obligation to put on a case.